# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs December 15, 2015

## STATE OF TENNESSEE v. MICHAEL ORLANDO FREEMAN

**Appeal from the Criminal Court for Hamilton County**
**No. 284536   Rebecca June Stern, Judge**

_____

**No. E2014-02054-CCA-R3-CD – Filed March 10, 2016**

_____

Following a jury trial, the Defendant, Michael Orlando Freeman, was convicted of attempted second degree murder, as a lesser included offense of attempted first degree murder; aggravated assault by infliction of serious bodily injury; and attempted aggravated rape by use of a deadly weapon.  See Tenn. Code Ann. §§ 39-13-202, -13-102, -13-502.  He was acquitted of especially aggravated kidnapping.  See Tenn. Code Ann. § 39-13-305.  The Defendant received an effective sentence of twelve years as a Range I, standard offender with release eligibility at thirty percent.  In this appeal as of right, the Defendant contends that: (1) the evidence is insufficient to support each of his convictions; (2) the trial court erred in denying his motion to dismiss based on the State's failure to preserve evidence pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999); (3) the prosecutor committed prosecutorial misconduct during closing argument, which prejudiced the outcome of his trial; and (4) the trial court erred in denying his motion for a new trial.  Following our review, we conclude that the Defendant's issues are without merit, and the judgments of the trial court are affirmed in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined.  ROGER A. PAGE, J., not participating.

Jonathan Thomas Turner (on appeal); and Michael Acuff (at trial), Chattanooga, Tennessee, for the appellant, Michael Orlando Freeman.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; M. Neal Pinkston, District Attorney General; and Christopher Matthew Rogers, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

On June 18, 2012, a Hamilton County grand jury returned an indictment charging the Defendant with attempted first degree murder, aggravated assault, attempted aggravated rape, and especially aggravated kidnapping. The case proceeded to a jury trial, where the following facts were adduced.

Investigator Taylor Walker testified that on March 15, 2012, he was a patrol officer with the Chattanooga Police Department ("CPD"). He was assigned to a patrol in the south Chattanooga area, where the Country Hearth Inn and Suites ("Country Hearth") is located. At approximately 4:00 p.m., Inv. Walker was dispatched to a stabbing at the Country Hearth, and he was the first officer to arrive on the scene.

Inv. Walker was "flagged down" by several people located on the second floor, and he "ran up the stairs" where he "observed victim [T.G.][1] on the ground" with "visible deep lacerations" and "a large amount of blood." Inv. Walker said that T.G. was unable to talk "due to being traumatized from the wounds." However, she was able to provide Inv. Walker with the name of her assailant, whom she identified as "Mike."

Inv. Walker inquired whether any of the bystanders had information relating to the attack. T.G.'s mother, R.G.,[2] was at the scene, and she told Inv. Walker that she lived on the third floor of the Country Hearth and had run to the second floor after hearing her daughter's screaming. R.G. informed Inv. Walker that when she arrived at her daughter's room, she saw a light-skinned black man fleeing the scene. R.G. also told Inv. Walker that she chased the man briefly, but he outpaced her. During his flight, the man dropped a knife, which officers later recovered.

R.G. testified that she was living on the third floor at the Country Hearth on March 15, 2012. She had lived at the Country Hearth for approximately two years. R.G. had spent the day with T.G., and the women had alternated spending time in each other's rooms. About an hour before the attack, R.G. was standing at her daughter's door when she saw the Defendant "coming up the steps" on his way to the third floor. R.G. noticed him because she had never seen him there before.

---

[1] It is the policy of this court to utilize initials when referring to victims of sex crimes.

[2] In order to further protect the victim's identity, we will also utilize initials when referring to her mother.

Just prior to the attack, R.G. was spending time in T.G.'s room, and T.G. asked her for a cigarette. R.G. went back to her room on the third floor to retrieve a cigarette, and when she went downstairs and knocked on her daughter's door, no one answered. She "kept knocking and knocking" and "then all of a sudden . . . heard [T.G.'s] screaming." She began "beating on the door and beating on the window and . . . hollering for help . . . ."

R.G. saw a bicycle sitting nearby, and she went to get it so that she could attempt to break out the hotel room's front window. Right after she turned around to grab the bicycle, the door to her daughter's room opened, and a man emerged from the room. The man began running, and R.G. chased him. R.G. was unable to catch up to the man, and she returned to her daughter's room, where she observed T.G. lying in a pool of blood. She asked T.G. who had attacked her, and T.G. responded that the man's name was "Mike."

R.G. told the police that the suspect was wearing a black jacket with either blue or beige pants, "some chicken house boots," and "a cap thing . . . from the chicken house." According to R.G., she was later shown a photographic lineup, and she identified the Defendant as the person whom she saw running out of T.G.'s room on the day of the attack.

CPD Investigator Caleb Brooks testified that he was the lead crime scene investigator in the instant case. He arrived at the Country Hearth at 4:50 p.m. He collected a knife with apparent blood stains on it found in a walkway at the hotel. Inv. Brooks described a trail of blood leading from the victim's room out into the second floor walkway. There was a pool of blood where T.G. had been lying in front of the door to her room.

Inv. Brooks testified that there was a significant amount of blood in the bathroom. There were blood stains in basin of the bathtub, on the outside of the tub, on the top of the toilet, and on the bathroom door. The cover to the toilet tank was broken. A towel with blood was recovered from the inside of the toilet bowl. The shower curtain also had blood stains on it and had been partially torn off the rod. Inv. Brooks testified that the side of the bathroom door facing out toward the bedroom had blood on it, but the side of the door facing into the bathroom did not.

According to Inv. Brooks, he "lifted" fingerprints from the inside handle of the exterior door, but it was later determined that there was "insufficient detail for comparison." Also, deoxyribonucleic acid ("DNA") testing was performed on several items collected from the room, but the only positive match was to T.G.'s DNA.

-3-

CPD Investigator Brian Rodgers testified that he worked in the crime scene unit and that he investigated the crime scene at the Country Hearth. Prior to arriving at the scene, Inv. Rodgers was asked to respond to the hospital to "process" the victim. Inv. Rodgers identified pictures that he took documenting the victim's injuries. The victim had a wound to the front of her neck and puncture wounds to her head and near her middle finger. Also, she sustained injuries to her left wrist and hand area, which had already been bandaged by the time Inv. Rodgers arrived at the hospital.

Miguel Vargas testified that he worked at Pilgrim's Pride, which processed poultry. According to Mr. Vargas, the Defendant worked at Pilgrim's Pride beginning on November 18, 2010, and his employment was terminated on March 22, 2012. The cause for his termination was "[t]hree day no call, no show[,]" which Mr. Vargas explained meant that the Defendant failed to show up for work without prior notice for three days in a row. In particular, the dates upon which the Defendant failed to go to work were March 20, 21, and 22. Mr. Vargas said that the Defendant worked from 6:01 a.m. until 3:01 p.m. on March 15, 2012.

Mr. Vargas agreed that the Defendant used a knife for work, but he said that the knife used to attack the victim was inconsistent with knives used by Pilgrim's Pride employees. According to Mr. Vargas, most of the employees wore large, black, rubber boots. Also, employees were required to wear a hair net and, where appropriate, a beard net, as well as standard white smocks.

CPD Investigator Christopher Blackwell testified that he was a "homicide major crimes investigator" and that he was the lead investigator in the present case. Upon learning of the Country Hearth attack, Inv. Blackwell, along with two other investigators, responded to Erlanger Hospital to speak with the victim. The investigators spoke briefly with the victim, who identified her attacker as "Mike." Thereafter, Inv. Blackwell went to the Country Hearth to oversee the crime scene investigation.

Inv. Blackwell was informed that although there was a security camera, none of the video was usable. After observing the scene for a few minutes, Inv. Blackwell proceeded "to go do a neighborhood canvass[,]" which involved knocking on doors at the hotel and attempting to gather information from potential witnesses. Inv. Blackwell testified that although several people reported hearing screaming, he obtained no meaningful leads.

Inv. Blackwell said that he spoke with the victim again at the hospital on March 16 and that he also spoke with her on March 19 at the "police service center." Prior to speaking with the victim on March 19, the victim called the police and told them that she had spotted her assailant, the Defendant. Inv. Blackwell went to the address where the

Defendant had been seen, and he observed a gray, older model Cutlass Supreme. Inv. Blackwell checked the vehicle's tags and learned that the car was registered to the Defendant. By the time Inv. Blackwell arrived at the scene, the Defendant was no longer present, but his girlfriend, Natasha Young, was there. Ms. Young told Inv. Blackwell that the Defendant had left the area just prior to the arrival of the police. A "be on the lookout" call was issued, and officers began looking for the Defendant in the area.

After making the call to police, the victim went to the police service center for a recorded interview. While she was there, she was also shown a photo lineup, and she identified the Defendant as the person who attacked her on March 15. Three days later, police executed a search warrant for Ms. Young's home, where the Defendant had been staying, and they recovered a pair of boots.

On cross-examination, Inv. Blackwell testified that he obtained a cell phone from the victim's hotel room, which was preserved as evidence. Inv. Blackwell said that he did not personally examine the phone and that the police "did not run the telephone and take out the contents of it." Inv. Blackwell agreed that T.G. informed him that the Defendant had called her on her cell phone prior to the attack, although she was unsure how he had obtained her phone number. According to Inv. Blackwell, the phone was returned to the victim in May.

T.G. testified that on March 15, 2012, she was living at the Country Hearth with her fiancée and two-year-old daughter. On March 14, she walked across the street to the "Kanku," a gas station convenience store. While at the Kanku, T.G. saw the Defendant for "the first time in [her] life[,]" and "he tried to holler at [her]" and made romantic advances toward her. She explained that the Defendant was with another woman but nonetheless "tried to talk to [T.G.]"; however, she ignored him and left the store. T.G. testified that the Defendant followed her out of the store and watched her as she walked down a dirt path that led back to the Country Hearth. According to T.G., the Defendant did not actually follow her down the path. She turned around to ensure he was not still behind her and saw the Defendant get into a gray Cutlass with the woman from the store.

On March 15, T.G. received a phone call from a number she did not recognize, but she did not make it to the phone in time to answer. She called the number back, but there was no answer. At some point, she got another call from the same number, which she answered. T.G. said that the caller was a male who asked her whether he was speaking with "Champagne"; she answered affirmatively, and he told her his name was Mike. The caller told her that he had seen her at the store on the previous day, and she "immediately got scared" and asked him how he got her phone number. However, she hung up before he answered. She said that she stored the number in her phone under the name Mike.

Approximately three hours later, T.G. was cleaning her room when the Defendant "walked in [her] room door" and told her that he was going to "f--k the s--t out of [her] and kill [her]." T.G. "turned around to try to grab either the hotel phone or [her] cell phone," and the Defendant "grabbed [her] with one hand and pulled [her] hair back and cut [her] across [the] neck . . . ."

T.G. testified that the Defendant took her to the bathroom and was "cutting [her] everywhere." She said that he was "banging" her head against the toilet. T.G. said that her pants were down, although she could not remember how they got down, and the Defendant was standing behind her with his penis out. She testified that his penis touched her buttocks. According to T.G., the Defendant told her that she was "sexy" and that she "smelled like cotton candy."

T.G. could hear her daughter's "hollering" in the bedroom. T.G. told the Defendant that she would "let [him] finish" if he would allow her to say goodbye to her daughter. According to T.G., the Defendant then let her out of the bathroom, she ran and grabbed her daughter and "undid the door." She said that the Defendant ran out the door, knocking her to the ground.

T.G. said that the knife the Defendant used was not a "normal" kitchen or steak knife but was "a knife that you would probably use in Vietnam or something." Following the attack, T.G. was taken to the hospital where she remained for two days. T.G. described her injuries as follows: a cut across her neck; a cut "in" her head; a "hole" in her head; a cut on her shoulder; cuts on both of her thumbs; and a cut on one of her hands. She stated that, following the attack, her thumbs were "hanging off" because she tried to fight back and grabbed the knife, which cut through her hands. As a result, T.G. said that she was still unable to bend her thumbs at the time of trial.

T.G. stated that she was certain that the Defendant was her assailant. She said that on March 19 she was with her fiancée when she spotted the gray Cutlass and saw the Defendant "bent over working on the car." The car was parked at Ms. Young's house. According to T.G., she got in her fiancée's truck and began "hollering 'that's him.'" She said that she immediately found police officers and "flagged them down." Later, she went to the police station, and she identified the Defendant in a photo lineup.

On cross-examination, T.G. denied saying in a statement to police that the Defendant called her on Wednesday March 14 shortly after seeing her at the Kanku. T.G. agreed that it is impossible to see her room at the Country Hearth from the Kanku. Thus, she agreed that from the Defendant's vantage point at the beginning of the path running between the Kanku and the Country Hearth, he could not have seen her room.

-6-

According to T.G., she was standing at the sink when she noticed that her room door was being opened; she walked toward the door; and the Defendant entered and shut the door. T.G. denied telling police that she had a conversation with him about a "blunt" or "gangs" when he entered the room. T.G. said that she knew investigators talked to her at the hospital on the day of the attack, but she could not remember what she told them because she was heavily medicated. T.G. denied inviting the Defendant to her hotel room that day to purchase marijuana. She also denied that there was another man in the room when the Defendant came to her hotel room that day.

T.G. testified that when the Defendant grabbed her, she was in between the two beds. She felt the knife across her neck, and the next thing she remembered was being in the bathroom.

T.G. said that she did not know how the Defendant obtained her cell phone number, but she testified that she had lived at the Country Hearth "for a long time" and knew "a lot of people" who worked at the Kanku. She suggested that someone there could have given her cell phone number to him.

T.G. recalled that in one of her statements to police, she said that the Defendant gained entry into her room by trying to "distract" her when he first opened the room door. She admitted that she did not include this detail in her trial testimony, but she explained that was because she "was just trying to get to the basic facts . . . ." T.G. testified that she "never had a chance to even try to stop him from coming in." She said that as soon as the Defendant entered the room and said he was going to rape and kill her, she tried to reach for either her cell phone, which was on one of the beds, or the hotel phone, which was on a nightstand between the beds.

The State rested, and Lisa Timmons, the Defendant's mother, testified for the defense. Ms. Timmons said that the Defendant came to her house on the afternoon of March 15 and that he "had blood on top of his head." The Defendant told her that he got hit in the head, and after he told her "what happened," she advised him to call the police.

Ms. Timmons testified that a police officer came to her house looking for the Defendant's cell phones. According to Ms. Timmons, she and the officer located three cell phones belonging to the Defendant, which were turned over to the police.

On cross-examination, Ms. Timmons was shown a picture of the Defendant taken two weeks after the assault, and she agreed that there were no signs of injuries on the Defendant's head or body. Ms. Timmons agreed that the Defendant told her he had been at the Country Hearth on March 15 and that he acted in self-defense after being attacked in the victim's hotel room. She said that she did not recognize the knife used in the assault.

Ms. Timmons initially said that the Defendant stopped going to work because he knew the police were looking for him, but she later asserted that the Defendant was absent from work because he was "supposed to [be] on vacation."

The defense recalled the victim to the stand, and a portion[3] of a previous interview she gave to police was played. In her statement to police, T.G. said that around 4:00 p.m. on March 15, the door to her room was cracked, and her mother had just left. She heard a knock on the door, and when she realized it was the Defendant, she tried to close the door. However, the Defendant "busted his way on in." At trial, T.G. explained that when she said she was trying to "keep him out" in the interview, she did not mean that the Defendant was outside the door to the room but rather that he was already in the doorway on his way in.

T.G. acknowledged that, in her previous statement to police, she said that the Defendant tried to "distract" her when he first entered the room by saying "look what your baby doing [sic]." She agreed that in her trial testimony on the previous day she had not mentioned this detail.

T.G. further claimed that she was heavily medicated at the time she spoke with police on March 19; thus, she had difficulty remembering exactly what she told the police at that time.

Inv. Blackwell was also recalled and testified that he interviewed T.G. three times—twice in the hospital and once at the police service center on March 19. According to Inv. Blackwell, T.G. did not appear to be intoxicated or under the influence of anything when he spoke to her on March 19.

The twenty-five-year-old Defendant testified that he first saw T.G. on a Wednesday night at the Kanku, where he had gone to "buy some smoke and pay for some gas." According to the Defendant, he was pumping gas into his car when T.G. exited the Kanku and began walking toward the Country Hearth. However, T.G. then turned around, walked towards the Defendant, and asked if he was "working," which he explained was a way of asking whether he had drugs to sell. The Defendant admitted that he sold marijuana at the time; but, he said that T.G. asked him for crack cocaine, which he did not have. However, he told her that he could get crack cocaine for her, and they exchanged phone numbers. The Defendant said that he told her his name was Mike, and she saved his phone number in her phone under that name. He also said that T.G. told

---

[3] Later, after noting that defense counsel's attempted impeachment of the victim was "excruciating," the trial court allowed the victim's recorded interview to be played in its entirety and then admitted the recording into evidence.

him her name was "Champagne." The Defendant said that T.G. "bought a ten dollar sack of marijuana from [him] and that was the end of the Wednesday night."

The Defendant testified that he next saw T.G. after he got off work on the following day. As he was leaving work, the Defendant saw that he had a missed call from T.G., and he called her back. T.G. told the Defendant that she had a friend who wanted to buy an ounce of marijuana from him. The Defendant quoted her a price for the marijuana, and he told her that he needed to return to his house to retrieve the drugs and that he would call her when he arrived at the Kanku.

According to the Defendant, he called T.G. when he got to the Kanku. He explained that he did not go straight to the Country Hearth because he "didn't know where she stayed at [sic]." T.G. told the Defendant that she lived on the second floor and provided her room number. While walking up to T.G.'s room, the Defendant saw a friend of his on the third floor, and he walked up to meet the friend. He said that he spoke with the friend for a few minutes before T.G. texted him and told him to "hurry up" because she had to go to work.

The Defendant went back downstairs, and he said that T.G. introduced him to her mother, R.G., outside of T.G.'s hotel room. After R.G. left, the Defendant followed T.G. into the hotel room. According to the Defendant, there was "a tall gentleman, an older gentleman leaning up against the wall towards [his] back." He said that he had never seen the man before.

The Defendant testified that T.G. asked him to "step inside the bathroom because she don't [sic] deal drugs in front of her child." The Defendant agreed, and he stepped into the bathroom. When the Defendant started to turn around, the unidentified man hit him on the head near his left temple with a pistol, causing the Defendant to stumble backwards. The Defendant maintained his balance by grabbing the shower curtain. The Defendant said he was dizzy after being hit and his head was throbbing. Also, he said that his short-term memory was affected by the blow to his head. According to the Defendant, when he was struck with the gun, he dropped a bag of marijuana that he had been holding. He surmised that the other man picked up the bag and left.

The Defendant testified that he was then alone with T.G. in the bathroom, and he saw there was a knife on the top of the toilet tank, which he and T.G. both reached for at the same time. The Defendant denied bringing a knife with him to T.G.'s room. The Defendant obtained the knife before T.G., and he "swung it towards her because . . . [he was] being attacked." The Defendant admitted striking T.G. with the knife but insisted he "wasn't trying to cause harm to her" but instead was "trying to fight [his] way up out

of there." The Defendant said his "perception" of what happened was that he "[had been] set up."

T.G. grabbed the knife blade in an attempt to wrest the knife away from the Defendant. According to the Defendant, he had the knife by the handle and T.G. grasped the blades, but she let go and grabbed the Defendant's hands. The Defendant and T.G. continued fighting for control of the knife, but he ultimately regained sole possession of the knife.

The Defendant testified that he did not remember dropping the knife outside the hotel room; rather, he recalled dropping the knife in the room after hearing a loud banging on the exterior door and becoming scared.

The Defendant said that the altercation was confined to the bathroom and did not take place in the bedroom, and he denied that either his or T.G.'s pants were down. The Defendant said that he did not go to T.G.'s room to have sex with her or to kill her. He averred that he was merely acting in self-defense when he stabbed the victim.

On cross-examination, the Defendant admitted that he did not call the police following the incident. He said that he was at his girlfriend's house on March 19, but he was not evading police when he left the house because he did not know that he was "a wanted man" at that time. He claimed that he walked around the corner to a friend's house and that he did not find out until later that the police were waiting for him at his girlfriend's house. However, he admitted that he "laid low" for another week after finding out he was wanted by authorities.

The Defendant claimed that he did not return to work the following week because he was "starting a vacation" and "there was no need for [him] to go back to work." He said that he did not know he had been "terminated" because that was not what his supervisor told him.

The Defendant admitted that he sold marijuana and "facilitate[d]" the sale of crack cocaine. He asserted that his girlfriend was not with him at the Kanku on Wednesday March 14. According to the Defendant, he and his girlfriend frequented the Kanku, and he opined that T.G. might have seen them there together on another occasion and mistaken it for that Wednesday night.

The Defendant said that T.G. asked him for an ounce of marijuana, which he valued at approximately $350. Because he did not typically carry that much marijuana on his person, he had to pick the drugs up from his house before meeting T.G. He said that he put the marijuana in a "sandwich bag," which he placed in his pocket. He did not change clothes and was still wearing his work clothes when he left to meet T.G.

-10-

According to the Defendant, he no longer had the phone that he used when communicating with T.G. The Defendant said that he was evicted from his apartment following his incarceration, that the cell phone was in his apartment, that whomever cleaned out his apartment moved his possessions to his mother's house, and that he did not know what happened to the phone.

The Defendant said that the unidentified male struck him with some type of handgun after he entered the bathroom. The Defendant said he was hit just as he was turning around and taking the marijuana out of his pocket to complete the drug sale. The Defendant reiterated that he did not see the knife upon entering the bathroom and that it was not until T.G. reached for the knife that he noticed it lying on top of the toilet tank. He agreed that it was a large knife, but he said that he "wasn't looking for anything" when he entered the bathroom, and thus, he did not notice it.

The Defendant did not recall hitting T.G. in her back or her head with the knife. According to the Defendant, T.G. never obtained sole possession of the knife, but at one point, both she and the Defendant had their hands on the handle of the knife. The Defendant testified that he made it out of the incident unscathed because T.G. "just didn't swing [the knife] at [him]."

The Defendant explained that he did not call the police because he did not want to admit that he was selling drugs.

Upon this evidence, the jury convicted the Defendant of attempted second degree murder, as a lesser included offense of attempted first degree murder, aggravated assault by infliction of serious bodily injury, and attempted aggravated rape by use of a deadly weapon. He was acquitted of the aggravated kidnapping charge. For his convictions, he received an effective sentence of twelve years to be served at thirty percent. It is from these judgments that the Defendant now timely appeals.

ANALYSIS

On appeal, the Defendant challenges the sufficiency of the evidence underlying each of his convictions. Additionally, he asserts that the trial court erred when it denied his motion to dismiss based on the State's failure to preserve evidence pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999); that the State committed prosecutorial misconduct during its closing argument; and that the trial court erred in denying his motion for a new trial. The State disagrees and asks that we affirm the Defendant's convictions in all respects.

-11-

## I. Sufficiency of the Evidence

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence are resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. <u>Bland</u>, 958 S.W.2d at 659; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." <u>State v. Cooper</u>, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." <u>State v. Williams</u>, 657, S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." <u>State v. Pendergrass</u>, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. <u>State v. Dorantes</u>, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." <u>Id.</u> at 380 (quoting <u>State v. Crawford</u>, 470 S.W.2d 610, 612 (Tenn. 1971) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." <u>Dorantes</u>, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . ." <u>Id.</u> at 380 (quoting <u>Holland v. United States</u>, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable

inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

### A. Sufficiency of Attempted Second Degree Murder Evidence

The Defendant contends that the evidence is insufficient to support his conviction for attempted second degree murder because the victim's testimony at trial "was inconsistent with her previous statements to officers and lacked credibility." The Defendant asserts that he "offered proof that he was acting in self-defense" and that his attack on the victim was "a means to protect himself." The State responds that the Defendant's argument is doomed because it consists entirely of a challenge to witness credibility, an issue which is solely within the province of the jury and which will not be second-guessed on appeal.

Second degree murder is statutorily defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person attempts to commit second degree murder when he acts with the intent to knowingly kill the victim and his conduct constitutes a substantial step towards the victim's death. Tenn. Code Ann. § 39-13-101(a)(3). A person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Whether a defendant acts knowingly is a question of fact for the jury. See State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer a defendant's mental state from "the character of the assault, the nature of the act and from all the circumstances of the case in evidence." Id. at 105.

In the light most favorable to the State, the evidence at trial showed that the Defendant entered into the victim's hotel room uninvited and promptly told her he was going to "f--k the s--t out of her and kill her." He proceeded to cut her throat and took her into the bathroom where he inflicted multiple injuries upon her with the knife and slammed her head into the toilet with such force that the top to the toilet tank broke, only letting her go when she promised to "let him finish" if he would just let her say goodbye to her two-year-old daughter who was "hollering" in the bedroom. This evidence supports a finding that the Defendant possessed the intent to knowingly kill the victim and that, by repeatedly stabbing her and slamming her head into the toilet, he took a substantial step toward doing so.

Although the Defendant avers that T.G. was not a credible witness, defense counsel thoroughly cross-examined T.G. and pointed out inconsistencies among her trial testimony and other statements given to the police. In fact, the Defendant recalled the victim to the stand after the State had rested in order to attempt to further impeach her based on an interview she had with police several days after the assault. Nevertheless,

the jury chose to accredit the victim's version of events. As we have oft repeated, the determination of issues of witness credibility and the resolution of conflicts in testimony rest squarely within the province of the jury. Bland, 958 S.W.2d at 659. The Defendant is not entitled to relief on this issue.

### B. Sufficiency of Aggravated Assault Evidence

The Defendant next asserts that the evidence was insufficient to support his conviction for aggravated assault because "evidence was put forth at trial that he acted in self-defense." We note that in his brief, the Defendant cites to the subsection of the aggravated assault statute which prohibits assault involving the use or display of a deadly weapon. However, the Defendant was indicted for and convicted of aggravated assault causing serious bodily injury. The State responds that the evidence was sufficient to support the Defendant's conviction.

As relevant here, aggravated assault is defined as follows: "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in [section] 39-13-101, and the assault . . . results in serious bodily injury to another . . . ." Tenn. Code Ann. § 39-13-102(a)(1)(A). "A person commits assault who . . . [i]ntentionally, knowingly or recklessly causes bodily injury to another . . . ." Tenn. Code Ann. § 39-13-101(a). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty . . . ." Tenn. Code Ann. § 39-11-106(a)(2). "Serious bodily injury" means bodily injury involving:

> (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) A broken bone of a child who is twelve (12) years of age or less[.]

Tenn. Code Ann. § 39-11-106(a)(34).

The Defendant offers no analysis as to whether the element of serious bodily injury was proven. In fact, as mentioned above, the Defendant analyzes this issue under the inappropriate subsection of the aggravated assault statute. Further, the entirety of the Defendant's argument is that "the evidence did not sufficiently demonstrate that he intentionally or knowingly caused the victim to reasonably fear imminent bodily injury, as evidence was put forth at trial that he acted in self-defense."

At trial, the victim testified that she remained in the hospital for two days following the attack, that she sustained numerous cuts and stab wounds, that she was heavily medicated for weeks following the assault, and that she was still unable to bend her thumbs due to the severity of the injury to her hands. The Defendant pummeled her head into the toilet with such force that the top to the toilet tank broke. Although the Defendant averred that he acted in self-defense, that defense was undermined by the Defendant's lack of injury, his failure to contact the police following the assault, and his admission that he "laid low" after learning the police were looking for him. Therefore, the State met its burden of proving that the Defendant intentionally or knowingly caused bodily injury to T.G.

Additionally, to support the aggravated assault conviction the State was required to prove, as charged in the indictment, that the Defendant's assault caused <u>serious</u> bodily injury. Panels of this court have previously found that the element of serious bodily injury embodied in subsection 39-11-106(a)(34)(E) was proven where the victim testified that he could not close his hand fully into a fist following an assault, <u>State v. Donald Prescott</u>, No. W2012-02454-CCA-R3-CD, 2014 WL 1464179, at *6 (Tenn. Crim. App. Apr. 11, 2014), and where the victim used crutches and a cane after his injury, had a severe limp lasting two months after the injury, and continued to have weakness in his leg two years after the assault, <u>State v. Jawaras Beauregard</u>, No. M2012-02312-CCA-R3-CD, 2013 WL 6047026, at *15 (Tenn. Crim. App. Nov. 14, 2013). We conclude that T.G.'s testimony that she could still not bend either of her thumbs established that she suffered a serious bodily injury based on the "protracted impairment or substantial loss of a function of a bodily member." <u>See</u> Tenn. Code Ann. § 39-11-106(a)(34)(E). Therefore, the evidence was sufficient to support the Defendant's aggravated assault conviction.

### C. Sufficiency of Attempted Aggravated Rape Conviction

Next, the Defendant contends that the evidence was insufficient to sustain his conviction for attempted aggravated rape. He again points to inconsistencies in T.G.'s testimony and relies upon the fact that no rape kit was completed by law enforcement in support of this contention.

As charged in the indictment, aggravated rape is the "unlawful sexual penetration of a victim by the defendant . . . accompanied by . . . [f]orce or coercion . . . used to accomplish the act and the defendant is armed with a weapon . . . ." Tenn. Code Ann. § 39-13-502(a)(1). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . ., but emission of semen in not required . . . ." Tenn. Code Ann. § 39-13-501(7). As relevant here, a person attempts to commit aggravated rape when he acts with the intent

-15-

to commit an aggravated rape and his actions constitute a substantial step toward the aggravated rape of the victim. See Tenn. Code Ann. § 39-12-101(a)(3).

The victim testified that the Defendant stated he was going to "f--k the s--t out of her" when he entered her hotel room. The Defendant stabbed the victim multiple times with a large knife, all the while telling her that she was "sexy" and "smelled like cotton candy." The victim said that both her pants and the Defendant's pants were down and that she could feel the Defendant's penis on her buttocks, although he did not penetrate her. Similar to his other sufficiency arguments, the Defendant avers that the victim's testimony "was inconsistent in terms of what (if any) sort of genital touching existed." However, the Defendant fails to provide any citation to instances in the record where the victim's testimony was inconsistent in this respect. Regardless, as we have previously stated, even if there were inconsistencies in T.G.'s testimony, they were resolved by the jury in favor of the State. Trial testimony revealed that the Defendant stated his intent to have sex with the victim, that he threatened and stabbed her with a knife, that he repeatedly slammed her head into the toilet, and that he attempted to penetrate her with his penis. Further, the Defendant fails to explain how law enforcement's failure to complete a rape kit renders the evidence insufficient to support his conviction. Accordingly, the evidence was sufficient to support the attempted aggravated rape conviction, and the Defendant is not entitled to relief on this issue.

## II. State's Failure to Preserve Evidence Pursuant to State v. Ferguson

The Defendant next asserts that the trial court should have granted his motion to dismiss based on the State's failure to preserve the victim's cell phone. In particular, the Defendant contends that the victim's cell phone could have been used to impeach her statements regarding telephonic contact she had with the Defendant prior to the assault. The State responds that there was no duty to maintain control of the cell phone because it "had no apparent exculpatory value, and the same information could have been obtained from cell phone records."

On November 2, 2012, the Defendant filed a "Motion . . . to Compel the State to Allow Inspection and Copying of the Contents of the Telephone of [T.G.] and to Require the Future Preservation of Telephone as Evidence." In the motion, the Defendant argued that "the victim's credibility [could] be significantly affected by the contents of the cell phone . . . ." According to the Defendant, the "cell phone records [would have] shown that [T.G.] initiated numerous cell phone contacts with the [D]efendant in contravention to her sworn testimony that she did not personally know the [D]efendant and did not contact him." The Defendant requested that he be allowed to access, inspect, and copy the contents of the cell phone, or, in the alternative, that the State conduct a forensic examination of the cell phone and provide the results of that analysis to him. Further, the

Defendant asked that the trial court issue an order compelling the State to preserve T.G.'s phone "for further evidence purposes."

No further action was taken on this issue until November 19, 2013, when the Defendant filed a "Motion to Dismiss Based on State's Failure to Preserve Evidence," alleging that the State failed in its duty to preserve the victim's cell phone. In his motion, the Defendant alleged that the CPD returned the victim's cell phone to her "[e]ven thought it appear[ed] that law enforcement officers recognized the evidentiary significance of this telephone." The Defendant attributed this recognition to the officers based on the victim's interview wherein she stated that there was telephone contact between herself and the Defendant prior to the attack. The Defendant said that the phone was necessary to "significantly impeach [T.G.'s] testimony by showing significant telephone contact between the [D]efendant and [T.G.] before the alleged crimes and that [T.G.] invited the [D]efendant to her hotel room." The Defendant alleged that access to the victim's cell phone would have allowed the defense to show "(1) that [T.G.] had in fact contacted the [D]efendant rather than vice versa, that (2) there were more frequent contacts evidencing some type of relationship between the two, and (3) thr[ough] text messages, exactly who invited who[m] and for what purpose on the day of the alleged offense." The Defendant asserted that he was unable to obtain "comparable evidence" because he could not "recover his personal telephone which would have recorded the other end of these communications"; "[t]ext messages were unavailable without the telephones themselves"; and "by the time that it was apparent that neither [T.G.'s] nor the [D]efendant's telephones would be found, the carrier no longer possessed records for the relevant dates."

At a hearing on the motion, the Defendant asserted that the cell phone "would have shown a number of phone calls which would have been harmful to [T.G's] credibility in this matter." According to the Defendant, he "[thought] that there would have been a lot more phone calls" than reported by the victim. The State responded that the Defendant had reasonable means to obtain the evidence other than from the victim's cell phone.

Investigator Puglise[4] testified that he was part of the investigation into the assault of T.G. and that T.G.'s cell phone was seized as evidence because it contained a phone number with the name "Michael" or "Mike." Inv. Puglise agreed that T.G. reported that she had exchanged phone calls with the "suspect" prior to the assault. According to Inv. Puglise, the phone number associated with the suspect's name was "documented," and the phone number was "run" through a police database to check for "any history of the number" in an attempt to "get a full name on that number." Inv. Puglise could not recall

---

[4] Inv. Puglise's first name was not provided.

seeing any text messages between T.G. and the number associated with the suspect, although he could not "say for sure if [he] saw [any]." He also could not recall how many phone calls were exchanged between those two numbers. Inv. Puglise testified that he was only involved in the investigation in the initial stages, and he was unsure whether police subjected the cell phone to further analysis. He confirmed that the cell phone was eventually returned to T.G.

William Dipilo, a private investigator for the defense, testified that he attempted to locate the Defendant's cell phone following his arrest. According to Mr. Dipilo, he spoke with the Defendant while he was in jail and "found out that his personal property . . . had been taken by various family members." Mr. Dipilo spoke with the Defendant's mother, whom he asked to "please do her best to retrieve [the Defendant's] cell phone." Ms. Timmons found three cell phones, which she gave to Mr. Dipilo, but after talking with the Defendant, he determined "that the cell phone that [the defense] needed was not one of the three cell phones." He said that "out of an abundance of caution" the cell phones were examined, and he confirmed that none matched the phone they were looking for. Mr. Dipilo said that he spoke with Ms. Young as well as the Defendant, his mother, and his sister when attempting to locate the phone, but to no avail.

Mr. Dipilo testified that the State provided discovery which included T.G.'s cell phone number, and he later discovered that there was another cell phone number for her. Next, Mr. Dipilo sent a subpoena duces tecum to Cricket, the victim's cell phone provider, "asking for all the pertinent information for those cell phone[s'] activity in March of 2012." According to Mr. Dipilo, he spoke with a representative from Cricket, who acknowledged receipt of the subpoena and who said that someone at Cricket had tried to fax the information to defense counsel's office; however, counsel never received it. The representative told Mr. Dipilo that he would try to fax the information again, but at the time of the hearing, the defense had still not received the requested information. The trial court interjected, and the following exchange occurred:

 [Trial Court]:  So they do have the cell phone records?

 [Mr. Dipilo]:  The cell phone records for those two numbers.  And we still don't have that information yet.

[Trial Court]: Let me ask.  What were you told in regard to these cell phone records in regard to how long they kept the cell phone records?

[Mr. Dipilo]:  Your Honor, Cricket told us that they kept those records for six months.

[Trial Court]: Yeah.  But they're acting like they still exist?

-18-

[Mr. Dipilo]:  That being the case, we were - -

[Trial Court]:  Have you ever been given any indication that they still exist?

[Mr. Dipilo]:  I was not told definitively that they did not exist, but we kept pressing to find out that answer.  And we're still waiting for that answer.

[Trial Court]: Well, just do a court order and send him out with my court order and pick them up.  If they exist, they exist.  And a subpoena duces tecum is not the best route to get them, I don't think.  I think it should have been done by an order.  . . . [D]o an order that they've got to give them to you by Wednesday.  Okay?  Why don't we try that and put this over until Wednesday and see if you've gotten them.  Okay?

[Defense Counsel]:  All right, Your Honor.

There is no order in the record relating to the production of these records, and the issue was not raised again until the motion for new trial.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution provide every defendant the right to a fair trial.  To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment.  Brady v. Maryland, 373 U.S. 83, 87 (1963).  Further, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt.  United States v. Agurs, 427 U.S. 97, 110-11 (1976).

In State v. Ferguson, 2 S.W.3d 912, 916 (Tenn. 1999), our state supreme court adopted a test for courts to use in determining whether the State's loss or destruction of evidence deprived a defendant of a fair trial.  The first step in analyzing whether a defendant's trial was fundamentally fair "is to determine whether the State had a duty to preserve the evidence."  Id. at 917.  The State's duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense."  Id. at 917.  This "materiality" standard requires proof that the evidence possesses an exculpatory value apparent prior to the destruction of the evidence and must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  Id.

Only if the proof establishes the existence of such a duty and that the State failed in that duty, will a trial court then conduct a balancing analysis involving the following

-19-

factors: "[(1)] [t]he degree of negligence involved; [(2)] [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and [(3)] [t]he sufficiency of the other evidence used at trial to support the conviction." Ferguson, 2 S.W.3d at 917 (footnote omitted). After considering all of these factors, if the trial court concludes "that a trial without the missing evidence would not be fundamentally fair," it may dismiss the charges or "craft such orders as may be appropriate to protect the defendant's fair trial rights." Id. On appeal, we apply a de novo standard of review to the trial court's decision on a Ferguson claim. State v. Merriman, 410 S.W.3d 779, 791 (2013).

The materiality standard requires that the victim's cell phone have "potential" exculpatory value. See Merriman, 410 S.W.3d at 792. The Defendant asserted that access to T.G.'s cell phone would have corroborated his version of events. In particular, the Defendant averred that the phone would establish that more communication occurred between himself and T.G. in the day or so leading up to the assault. Such evidence would have been contrary to T.G.'s testimony regarding her telephone calls with the Defendant. Also, the Defendant claimed that the phone would have shown text messages further corroborating his account. The Defendant pointed out that, in her interview with police, T.G. stated that she had been in contact with the Defendant prior to the assault. Also, the police kept the phone in their possession from the time of the attack in March until sometime in May, and Inv. Blackwell admitted that the phone was not subjected to any analysis during that time. If the cell phone did in fact establish more frequent phone contact or that the victim initiated contact via telephone, we agree that the Defendant's alternate explanation would have been strengthened and that the jury might have afforded his version of events more weight. Therefore, we conclude that the cell phone did have potential exculpatory value.

However, before we conclude that the State had a duty to preserve the evidence, we must also find that the Defendant was unable to obtain evidence comparable to the cell phone by other reasonably available means. At the hearing on the motion to dismiss, defense counsel told the trial court that he had subpoenaed Cricket for the victim's telephone records but had not yet received the records. The trial court instructed defense counsel to write an order that it would sign compelling the production of records. No such order appears in the record. From this, we can only assume that defense counsel relinquished his efforts to obtain the cell phone records.

Also, in his written motion to dismiss, the Defendant averred that the cell phone records were no longer available due to the passage of time. However, at the hearing on the motion, held a little over a week after the date the written motion was filed, the Defendant claimed that Cricket had attempted to fax a response to his request for the records, although there was apparently a problem with the transmission. Counsel was

-20-

unsure whether that fax contained the records or instead indicated that the records could no longer be retrieved. Consequently, there is nothing in the record affirmatively establishing that the telephone records were unobtainable at the time requested by the defense. We further note that there is nothing in the record regarding the Defendant's cell phone provider, and there is likewise no documentation of any attempt to obtain the relevant records from that provider.

We also point out that counsel was appointed to the Defendant's case in July 2012, but it appears that no action was taken regarding the cell phone or records until November 2012, at which point the victim's cell phone had long since been returned to her. Furthermore, there was no action from the trial court on the Defendant's motion to compel, and he waited a full year before filing the motion to dismiss based on the alleged Ferguson violation. Additionally, the Defendant acknowledges that the desired information would have been available to him had he been able to locate his own cell phone. We find it dubious that the Defendant should fault the State for failing to preserve evidence which he himself also failed to safeguard. The timing of the Defendant's motions and his failure to follow-up with the trial court's directives after the hearing on the motion to dismiss show that he was less than diligent in his attempts to procure the desired evidence. We caution that Ferguson does not discharge a defendant's obligation to conduct expedient investigations and to secure relevant, material evidence whenever possible. Cf. United States v. McKenzie, 768 F.2d 602, 608 (5th Cir. 1985) (noting that "Brady does not oblige the government to provide the defendant[] with evidence that [he] could obtain from other sources by exercising reasonable diligence" and that the defendant "must bear the responsibility of his failure to seek its discovery") (citations omitted); State v. Leath, 461 S.W.3d 73, 113 (Tenn. Crim. App. 2013) (noting in context of Brady claim that "the State is not required to disclose 'information that the accused already possesses or is able to obtain'") (citing State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992)).

Because we have determined that the Defendant could have obtained comparable evidence from the victim's cell phone provider, or from his own cell phone or service provider, we conclude that the State did not have a duty to preserve the victim's cell phone. This issue is without merit.

### III. Prosecutorial Misconduct

Next, the Defendant contends that the prosecutor "improperly bolstered the testimony of the victim" during closing argument. The Defendant takes issue with the following statement made by the prosecutor: "If she was making it up, why would she include details about his genitalia? The size of his penis? Which she accurately described for the police." The Defendant avers that this statement "was meant to express

-21-

the State's personal belief and opinion as to the truth or falsity of the victim's testimony, was prejudicial to the [Defendant,] and resulted in plain error." Pointing out the absence of a contemporaneous objection to this statement during trial, the State responds that the Defendant has waived plenary review and failed to prove plain error.

In the recording of the victim's previous interview with police, which was played after she was recalled to the stand, the following exchange between the victim and the interviewer took place:

Unidentified Male Voice: You say you remember what he looks like when he pulled his pants down.

[T.G.]: Yeah, I remember that too.

Unidentified Male Voice: Is there any distinguishing marks or anything --

[T.G.]: No, he's just oversized. He's too oversized.

Unidentified Male Voice: Down there, he's oversized?

[T.G.]: Yes.

In closing argument, the prosecutor made the following statement: "If she was making it up, why would she include details about his genitalia? The size of his penis? Which she accurately described for the police." Defense counsel made no objection, but asked for a bench conference after the conclusion of the prosecutor's argument. Defense counsel suggested that the prosecutor's statement regarding the victim's description of the Defendant's genitalia had not been offered as proof during the trial. The trial court responded that counsel "didn't object at the time" and that "it would [not] have made any difference. This is closing argument. It's done."

At the hearing on the motion for new trial, defense counsel renewed his argument that the prosecutor's statement was improper. In particular, counsel pointed out that, although the victim's recorded statement made reference to the size of the Defendant's penis, there was "no evidence . . . that that information that she had provided was accurate." Defense counsel admitted that he did not object contemporaneously but explained that he "thought it best to not bring attention right there at the very end of the argument . . . ." Counsel continued, "I thought that bringing it up two minutes before the end of that argument would in fact have put more emphasis on it, and I waited until the end to bring that up . . . ."

-22-

In response to counsel's argument, the prosecutor stated that he could not recall the specific statement defense counsel was referring to, but that it was not his "intent to try to bolster her credibility at all," and he "was just trying to say that after enduring such a traumatic experience she gave details about the events clearly . . . ."

The court denied the motion for new trial, and with respect to the prosecutorial misconduct issue, the court stated that it did not "think [the statement] was highly prejudicial, but [it] also gave the jury an instruction that if the statements made by attorneys [were] not supported by the evidence they should disregard it."

Trial courts have substantial discretionary authority in determining the propriety of final argument, and although counsel is generally given wide latitude, trial judges must restrict any improper commentary. See Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). Closing arguments must be temperate, must be based upon evidence introduced during trial, and must be relevant to the issues at trial. See State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). The State should refrain from argument designed to inflame or incite the emotions of the jury. See Coker, 911 S.W.2d at 368.

We have previously observed that there are five generally recognized areas of prosecutorial misconduct related to argument: (1) it is unprofessional conduct for the prosecutor to intentionally misstate the evidence or mislead the jury as to the inferences it may draw; (2) it is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony, evidence, or the guilt of the defendant; (3) the prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury; (4) the prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions of the consequences of the jury's verdict; and (5) it is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). When a defendant makes allegations of prosecutorial misconduct, on appeal, this court reviews the record to see "whether such conduct could have affected the verdict to the prejudice of the defendant." State v. Smith, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990). In other words, it will be reversible error if the improper comments of the prosecutor were so improper or the argument so inflammatory that it affected the verdict. See State v. Reid, 164 S.W.3d 286, 344 (Tenn. 2005); Harrington v. State, 385 S.W.2d 758, 759 (1965). The factors to aid us in making this determination include:

> (1) the conduct complained of viewed in the context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecution; (3) the intent of the prosecutor in making the

improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); see also Goltz, 111 S.W.3d at 5-6.

First, we note that the Defendant failed to contemporaneously object to the prosecutor's statement at trial. It is well-settled that defense counsel is obligated to object contemporaneously whenever it deems the prosecution to be making improper argument. See State v. Jordan, 325 S.W.3d 1, 57 (Tenn. 2010). Defense counsel's failure to object contemporaneously will typically result in waiver of the issue on appeal. Id. at 58; Tenn. R. App. P. 36(a) (providing that an appellate court need not grant relief where the complaining party failed to take reasonable available action to prevent or nullify an error). Defense counsel's fear that objecting during closing argument would draw attention to the prosecutor's statement is not an adequate excuse for failing to lodge a timely objection.

Because of the failure to contemporaneously object, this error would be reversible only if it rises to the level of plain error. The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

We note that other than the conclusory statement that the prosecutor's statement "resulted in plain error," the Defendant does not ask us to review this issue under plain error, does not cite to the relevant legal standards governing plain error review, and provides no analysis or argument of the issue based on those standards. Consequently, this issue is suitable for waiver pursuant to Rule 10(b) of the Rules of the Court of Criminal Appeals. ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.")

Waiver notwithstanding, although the Defendant characterizes this comment as improper vouching, we believe it can more properly characterized as arguing facts outside the record, which was the argument proffered by trial counsel at trial and at the hearing on the motion for new trial. In particular, there was nothing introduced at trial that would corroborate the victim's description of the Defendant's genitalia. Therefore, the prosecutor's statement that the victim "accurately described" the size of the Defendant's penis was unsupported by the trial evidence and was improper.

However, the record does not support a finding of plain error because the Defendant has failed to show that a substantial right was adversely affected. Page, 184 S.W.3d at 230. "Generally, 'relief for error is tied in some way to prejudicial effect, and the standard phrased as "error that affects substantial rights," . . . has previously been taken to mean error with a prejudicial effect on the outcome of a judicial proceeding.'" State v. Gann, 251 S.W.3d 446 (Tenn. Crim. App. 2007) (quoting United States v. Dominguez Benitez, 542 U.S. 74, 82 (2004)). During the perfunctory treatment of this issue in the Defendant's brief, he claims that this statement was harmful because "the evidence to support the attempted rape charge was lacking." However, as previously discussed, the evidence supporting the Defendant's attempted aggravated rape charge was more than sufficient in light of evidence that the Defendant stated his intent to rape the victim and attempted to penetrate her while attacking her with a knife. Therefore, it is our view that the prosecutor's brief statement, although improper, ultimately had no effect on the verdict and was not prejudicial to the Defendant. Accordingly, the Defendant is not entitled to relief on this issue.

*IV. Motion for New Trial*

Finally, the Defendant contends that the trial court abused its discretion when it denied his motion for new trial. As support for this issue, the Defendant rehashes his previous arguments that the evidence was insufficient to support his convictions due to inconsistencies in the evidence, that the State's failure to preserve the victim's cell phone was a Ferguson violation, and that the trial court's failure to provide a remedy for the prosecutor's misconduct was error.

The trial court's decision whether to deny a motion for new trial is within its sound discretion. See Tenn. R. Crim. P. 33. A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). As we have previously rejected each of the Defendant's assignments of error on appeal that were also raised in his motion for new trial, we conclude that the trial court acted well within its discretion when denying that motion, and the Defendant is not entitled to relief.

## CONCLUSION

Based up on the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE